**UNITED STATES of America,**
**Plaintiff,**

v.

**Masao FUJII Defendant.**

**No. 00CR17.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 25, 2000.

Andrea Paula Taylor, Federal Defender Program, Chicago,IL, Kaaren M. Plant, Chicago, IL, Linda Amdur, Chicago, IL, Ellen R Domph, Chicago, IL, for Masao Fujii (1) aka Yasuo Tamura, defendant.

Ricardo Meza, United States Attorney's Office, Chicago, IL, for U.S. Attorneys.

*RULING ON DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF THE GOVERNMENT'S HANDWRITING EXPERT*

GOTTSCHALL, District Judge.

Defendant Fujii has moved in limine to exclude the testimony of the government's handwriting expert, Karen Ann Cox. The government proposes to call Ms. Cox to identify the defendant as the writer of certain handprinted immigration forms submitted at John F. Kennedy International Airport in New York in December

1999 in connection with the attempted fraudulent entry of two Chinese nationals; the court has previously ruled that the December 1999 smuggling evidence, if otherwise admissible, can be offered under Rule 404(b). On July 17, 2000, the court held a *Daubert* hearing to determine if Ms. Cox may testify as an expert in this case. Having heard the evidence and reviewed the submissions of the parties, the court concludes that, at least in the peculiar circumstances of this case, Ms. Cox's testimony is inadmissible under the standards of *Daubert.*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that when a party proffers expert scientific testimony, the trial judge must determine, as a condition to the admission of the testimony, "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786. "This entails," the Court continued, "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. In making this assessment, the Court pointed out, there are a number of pertinent considerations including whether the technique or methodology at issue has been or can be tested, whether it has been subject to peer review and publication, what is the technique's or methodology's known or potential rate of error and whether the technique has been generally accepted in the relevant community. *Id.* at 593–94, 113 S.Ct. 2786. Later, in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court made clear that the trial court's gatekeeper function under *Daubert* extends to the testimony of engineers and others who are not scientists. The test for determining the admissibility of a given expertise, the Court emphasized, is flexible, and the district court has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 1171.

Since the *Daubert* decision, a number of courts have scrutinized the field of handwriting analysis under its standards with differing results. Prior to *Kumho,* the Sixth Circuit affirmed a district court decision allowing handwriting identification testimony, relying largely on Evidence Rule 901. *United States v. Jones,* 107 F.3d 1147, 1158–60 (6th Cir.1997). Since *Kumho,* a number of district courts have excluded expert opinions on handwriting identification, while sometimes permitting handwriting experts to testify about handwriting itself to assist the jury in making its own determination. *See United States v. Rutherford,* 104 F.Supp.2d 1190 (D.Neb. 2000); *United States v. Santillan,* 1999 WL 1201765 (N.D.Cal.1999); *United States v. Hines,* 55 F.Supp.2d 62 (D.Mass. 1999). *But see United States v. Paul,* 175 F.3d 906, 910–11 (11th Cir.), *cert. denied,* 528 U.S. 1023, 120 S.Ct. 535, 145 L.Ed.2d 415 (1999).

Handwriting analysis does not stand up well under the *Daubert* standards. Despite its long history of use and acceptance, validation studies supporting its reliability are few, and the few that exist have been criticized for methodological flaws. (Tr. 57–61.) Further, as discussed in *Hines, supra* at 68, there has been no peer review by an unbiased and financially disinterested community of practitioners and academics; the acceptance of handwriting identification expertise has largely been driven by handwriting experts. It potential rate of error is almost entirely unknown. In the study relied on by the

government's expert, the Kam study, a sample of 105 forensic document examiners and 41 laypeople were tested; 38% of the laypeople made an incorrect match while only 6.5% of the experts made an incorrect match. (Tr. 11–12) But according to the evidence presented to this court, there are few if any other studies in existence that tend to validate the reliability of handwriting analysis. The defense expert in this case testified to studies that have undermined some of handwriting analysis' key principles, such as its principle that no two people write exactly alike. (Tr. 54–55. *See also* tr.67–68, 70.) Of course, on the fourth test, general acceptance, handwriting analysis scores high.

This court need not weigh in on this question, however, for whether handwriting analysis *per se* meets the *Daubert* standards, its application to this case poses more significant problems. The questioned writing in this case was handprinting. Typical handwriting analysis involves cursive writing, and the record is devoid of evidence that there is even a recognized field of expertise in the identification of handprinting. While Ms. Cox testified that many of the documents she examines at the INS involve handprinting, and while she testified that in her prior employment with ATF, she was tested in identifying handprinting, "erred," studied, was retested and passed, the court has no idea whether there is a recognized and accepted expertise in identifying handprinted documents, let alone whether Ms. Cox is an expert in this putative field. Michael Saks, who testified for the defense, testified that he was aware of only one study of the reliability of handprinting identification, and in that study, only 13% of the handwriting experts tested got the right answer; 45% identified the wrong person. (Tr. 63.)

The reliability of handprinting identification, however, is only part of the problem. The government has offered no evidence that Ms. Cox's expertise extends to making an identification of handprinting when the handprinter[s] in question are native Japanese writers. Neither the government's expert, Ms. Cox, nor the defendant's witness, Mr. Saks, is aware of any studies attempting to validate handprinting (or even handwriting) identification of the writings of foreign-trained writers. (Tr. 31–32, 66.) Following the hearing, the defense submitted the affidavit of Mark Litwicki, Director of Loyola University's English as a Second Language program. Mr. Litwicki avers that he has had extensive experience examining the handwriting styles of foreign students, including Japanese students, as he has taught many Japanese students in this country. He further avers that he spent two years teaching English to Japanese students in Japan and is "especially familiar with the manner in which Japanese-trained writers make the characters of the English alphabet." Mr. Litwicki avers that the Japanese language requires its students to spend a great deal of time learning to write several thousand Japanese characters, that uniformity of characters is "an important and valued principle of Japanese handwriting," that Japanese students "spend many years attempting to maximize the uniformity of their writing" and that "Japanese-trained writers also tend to write English characters in a very uniform manner." Mr. Litwicki concludes, "In my opinion, it would be very difficult for an individual not familiar with the English handwriting of Japanese writers to identify the subtle dissimilarities in the handwriting of individual writers."

Ms. Cox testified that there are four principles she uses in conducting handwriting analyses: that no two people write exactly alike, that no one person writes

942

exactly the same way when repeating, that there is a certain skill level in an individual's writing that that individual cannot surpass and that there are habits and peculiarities in one person's writing that are repeated. (Tr. 17.) It is this last principle that raises a troubling problem in dealing with a native Japanese writer. Does Ms. Cox have any expertise which would allow her to distinguish between unique characteristics of an individual Japanese handprinter and characteristics that might be common to many or all native Japanese handprinters? In an analysis that depends entirely on what is similar between writing specimens and what is different, it would seem to this court essential that an expert have some ability to screen out characteristics which might appear eccentric to the writer, compared to native English printers, but which might in fact be characteristic of most or all native Japanese writers, schooled in English printing in Japan, in printing English. There is no evidence in the record that Ms. Cox has such expertise or has even considered the problem Mr. Litwicki has pointed out.

Considering the questions about handwriting analysis generally under *Daubert*, the lack of any evidence that the identification of handprinting is an expertise that meets the *Daubert* standards and the questions that have been raised—which the government has not attempted to answer—about its expert's ability to opine reliably on handprinting identification in dealing with native Japanese writers taught English printing in Japan, the court grants the defendant's motion.