## NEALL v. UNITED STATES.

### (Circuit Court of Appeals, Ninth Circuit. October 27, 1902.)

### No. 773.

1. CRIMINAL OFFENSE BY ARMY OFFICER—JURISDICTION OF CIVIL COURTS—FORGERY.

A district court has jurisdiction to indict and try a person charged with having forged an obligation of the United States with intent to defraud, which is made an offense against the United States by Rev. St. § 5414 [U. S. Comp. St. 1901, p. 3662], although he was at the time an officer of the army, and the alleged offense was committed at a military post, and with intent to defraud an enlisted soldier, where the accused has since been discharged from the army without any action against him having been taken by the military authorities; there being no provision, either constitutional or statutory, conferring exclusive jurisdiction on courts-martial to punish such offense.

2. FORGERY—SUFFICIENCY OF INDICTMENT—DUPLICITY.

An indictment under Rev. St. § 5414 [U. S. Comp. St. 1901, p. 3662], for the forgery of an obligation of the United States with intent to defraud, is not bad for duplicity because it charges in a single count an intent to defraud both the United States and a soldier in the army, where the instrument charged to have been forged purported to be a certificate of deposit issued by the United States to the soldier; it being impossible in such case to aver or prove with certainty a specific intent to defraud either one rather than the other, the law will impute to the act an intent to defraud all who might have been thereby defrauded.

3. SAME—DESCRIPTION OF OFFENSE.

An indictment for forging a certificate of deposit purporting to have been issued on behalf of the United States to an enlisted soldier, by signing thereto the name of a person described as an officer and deputy paymaster general, with intent to defraud the depositor named therein, need not aver that the person whose name was signed was in fact the officer he was represented to be in the instrument.

4. SAME—OBLIGATION OF UNITED STATES—CERTIFICATE OF DEPOSIT.

A certificate issued by an army paymaster to an enlisted man, acknowledging the receipt of money deposited under the provisions of Rev. St. § 1305 [U. S. Comp. St. 1901, p. 925], is a certificate of deposit, and "an obligation or security of the United States," as defined in Rev. St. § 5413 [U. S. Comp. St. p. 3662], the forgery of which is made a criminal offense by the following section.

5. SAME—PROOF OF HANDWRITING—OPINION OF EXPERT.

In a prosecution for forgery a witness who qualifies as a handwriting expert, and who testifies that he has examined a sufficient number of specimens of defendant's handwriting to enable him to so testify, may properly be permitted to state his opinion that the signature alleged to have been forged was written by defendant.

6. SAME—QUALIFICATION OF WITNESS TO STATE OPINION.

A knowledge of the handwriting of a defendant charged with forgery, by a witness who is not an expert, does not qualify him to state his opinion whether or not the forged signature, made in imitation of the handwriting of another, was written by defendant.

In Error to the District Court of the United States for the Northern District of California.

The plaintiff in error was convicted of forgery upon an indictment under section 5414 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3662]. The indictment charged as follows:

"That J. M. Neall, late of the Northern district of California, heretofore,

¶ 5. See Criminal Law, vol. 14, Cent. Dig. §§ 1066, 1080.

to wit, on the 10th day of June, in the year of our Lord one thousand eight hundred and ninety-eight, at the city and county of San Francisco, in the state and Northern district of California, then and there being, then and there had in his possession a certain obligation of the United States, to wit, a certain certificate of deposit dated, Presidio of S. F., Cal., June 10th, 1898, for the sum of four hundred and sixty dollars, in favor of John Cranson, who was then and there a private in Company B, 4th regiment, United States Army, duly enlisted as such, the tenor of which said certificate of deposit is as follows, to wit:

"'Presidio S. F. Cal., June 10th, 1898.

"'$460.00/100. Received this day of Private John Cranson, Co. "B," 4 Reg't U. S. Army, for deposit under secs. 1305 and 1306, R. S., four hundred and sixty dollars.  _____,

"'Lt. Col. and Depty Paymaster Genl. U. S. A.

"'Attest: J. M. Neall, 1st Lieut. 4 Cavy. Commanding Company.'

"And that the said J. M. Neall, so having the said obligation of the United States in his possession as aforesaid, on the said tenth day of June, in the year one thousand eight hundred and ninety-eight, at the city and county of San Francisco, and within the jurisdiction of this honorable court then and there being, with intent to defraud the United States and the said John Cranson in the said obligation mentioned, did then and there unlawfully, knowingly, and feloniously falsely forge upon the face of the said certificate of deposit and obligation of the United States, in the place indicated for the signature of the Lt. Col. and Depty. Paymaster Genl. U. S. A., a certain material indorsement and signature, of the tenor following, to wit, 'F. M. Coxe,' whereby the said J. M. Neall, in manner and form aforesaid, with intent to defraud, feloniously did falsely forge an obligation of the said United States, against the peace and dignity of the United States of America, and contrary to the form of the statute of the said United States of America in such case made and provided."

To this indictment the plaintiff in error demurred. The demurrer was overruled, and the plaintiff in error thereupon pleaded not guilty, upon which plea he was tried before a jury, and was convicted and sentenced to two years' imprisonment in the penitentiary.

Crittenden Thornton, for plaintiff in error.

Marshall B. Woodworth, U. S. Atty., and Edward J. Banning, Asst. U. S. Atty., for defendant in error.

E. H. Crowder, Judge Advocate U. S. Army, amicus curiæ.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The plaintiff in error assigns as error the ruling of the district court upon the objections to the indictment which were the grounds of his demurrer, and earnestly contends that the court had no jurisdiction of the offense charged in the indictment, for the reason that it appears on the face thereof that the plaintiff in error was, at the time when he was alleged to have committed the offense, an officer of the United States army, at a military post of the United States, and is charged with having committed an offense against an enlisted soldier of the army, and that, therefore, he was amenable only to a court-martial under the provisions of the articles of war, section 1342 of the Revised Statutes [U. S. Comp. St. 1901, p. 944]. We have given this contention the careful consideration to which its importance entitles it. The section of the Revised Statutes, 5414 [U. S. Comp. St. 1901, p. 3662], under which the indictment is found, refers in terms to "every person

who with intent to defraud falsely makes, forges, counterfeits, or alters an obligation or security of the United States." The provision is comprehensive in its scope, and it includes as well an officer of the army of the United States as all other persons within the jurisdiction of the United States, unless he is exempted from its operation by some provision of the constitution or some other statute. It is not contended that any statute in express terms gives exclusive jurisdiction to a court-martial of the offense which is charged against the plaintiff in error, but it is urged that such is the meaning and purport of the constitution and the articles of war. Reference is made to the fifth amendment, which declares the general rule that no person shall be held to answer for a capital or otherwise infamous crime unless on the presentment of a grand jury shall not apply "in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger"; and to article 1, § 8, of the constitution, which confers upon congress power to declare war, to raise and support armies, and to make rules for the government and regulation of the land and naval forces; and to the sixtieth article of war (section 1342, Rev. St. [U. S. Comp. St. 1901, p. 944] ), which enacts that forgery committed by any person in the military service of the United States is an offense triable and punishable by court-martial with fine and imprisonment, and further provides that any one guilty of any of the offenses enumerated in the articles of war while in the military service of the United States, and subsequently dismissed, shall continue to be liable to be arrested and held for trial and sentence in the same manner and to the same extent as if he had not received such discharge. The plaintiff in error cites and relies upon, also, U. S. v. Bevans, 3 Wheat. 336, 4 L. Ed. 404, U. S. v. Mackenzie, 26 Fed. Cas. 1118 (No. 15,690), and U. S. v. Mackenzie, 30 Fed. Cas. 1160 (No. 18,313), as sustaining the view that it is the purpose of the constitution and the statutes to confer upon courts-martial the exclusive jurisdiction of such a case as this.

In the case first cited Marshall, chief justice, discussed the question whether a crime committed by a marine in the service of the United States on board a ship of war belonging to the United States lying at anchor in Boston Harbor could be tried for that offense in the circuit court of the United States for the district of Massachusetts. The conclusion which was reached was that under the eighth section of the act of April 30, 1790, providing for the punishment of certain crimes against the United States, no jurisdiction was given to the federal court of the offense charged, for the reason that the act gives such courts cognizance only of certain offenses on the high seas, or in any river, haven, basin, or bay "out of the jurisdiction of any particular state," and that the offense, having been committed in the Boston Harbor, was not out of the jurisdiction of Massachusetts, and therefore not within the jurisdiction of the federal court. It was held in that case, moreover, that the provision of the constitution extending the judicial power of the United States "to all cases of admiralty and maritime jurisdiction" did not, of itself, confer jurisdiction of the offense, as it gave to congress only the power to legislate,—a power which had not been exercised. The learned chief justice then pro-

ceeded to inquire whether section 3 of the act of 1790, which enacts "that if any person or persons shall within any fort, arsenal, dockyard, magazine, or in any other place or district of country under the sole and exclusive jurisdiction of the United States, commit the crime of murder," etc., brought the offense within the cognizance of the United States court, and concluded that the deck of a man-of-war is not a "place," within the purport of that section. He then proceeded to remark, in the language which is relied upon by the plaintiff in error:

"This construction is strengthened by the fact that at the time of passing this law the United States did not possess a single ship of war. It may therefore be reasonably supposed that a provision for the punishment of crimes in the navy might be postponed until some provision for a navy should be made. While taking this view of the subject, it is not entirely unworthy of remark that afterwards, when a navy was created, and congress did proceed to make rules for its regulation and government, no jurisdiction is given to the courts of the United States of any crime committed on a ship of war, wherever it may be stationed."

We think this utterance of the court was intended only to direct attention to the fact that, when in the course of congressional legislation a navy was created, there was in the act creating it no express provision making crime committed on a ship of war, wherever it may be stationed, triable in the courts of the United States. The chief justice meant to say, in other words, that, when congress did create a navy, vessels of war were not by express legislation placed in the category of "forts," "arsenals," "dockyards," etc., as those terms are used in the crimes act of 1790, above referred to. The context of the opinion shows that the sentence so quoted was intended only to fortify the view of the court already expressed, that a ship of war was not a "place," within the purport of that act. We find in it nothing to sustain the contention of the plaintiff in error in the case at bar.

In the second case (U. S. v. Mackenzie) application was made to Betts, district judge, under the crimes act of 1790 (section 8), to issue a warrant for the arrest of Mackenzie and Gansevoort, officers of the United States navy, for murder committed on a naval vessel on the high seas. In dealing with the application the court referred to the fifth amendment, and to the jurisdiction given to courts-martial in such a case, and to the provision of the act of April 23, 1800, art. 21, which enacted "that the crime of murder committed by an officer belonging to any public vessel of the United States, without the territorial jurisdiction of the United States, may be punished with death by the sentence of a court-martial"; referred to the opinion of Atty. Gen. Pinckney, who had expressed the view that a naval court-martial ought not to try to punish a murder committed on board a United States ship, but that the jurisdiction belonged to the ordinary civil tribunals; and alluded to the decision of the supreme court in U. S. v. Bevans as intimating a strong opinion that the crimes act of 1790, § 8, did not embrace offenses committed on board ships of the United States. The court then directed attention to the crimes act of March 3, 1825, which contained the proviso that nothing therein contained "shall be construed to take away or impair the right of any court-martial to punish any offense which by the law of the United States

may be punishable by such court," and expressed the opinion that this proviso indicated the intention of congress that the concurrent jurisdiction of courts-martial with civil courts over offenses within the cognizance of both shall not be abrogated or suspended; but the court proceeded to remark that, even upon the theory that civil courts only had jurisdiction to take cognizance of the case, the district court would have declined to issue the warrant at that time, for the reason that a regularly organized court of inquiry instituted by the secretary of the navy was then investigating the case, and no step could be taken by civil authority without drawing away from the naval court the principal witnesses for the prosecution, and thereby causing a suspension of action by such court. It is to be observed that the naval court referred to was not a court-martial, but a court of inquiry, convened under the act of congress of April 23, 1800, art. 1. All that was actually decided by Judge Betts in that case was that the district court of the United States would not issue a warrant to arrest parties charged with having committed the crime of murder on the high seas, pending an investigation of that crime by a court of inquiry instituted by the secretary of the navy. It was not decided that the district court had no jurisdiction of the offense, or that exclusive jurisdiction thereof was given by law to a court-martial.

The third case (U. S. v. Mackenzie, 30 Fed. Cas. 1160 [No. 18,313] ) is not an adjudicated case, but the report of the charge of Judge Betts to a grand jury concerning their power to inquire into the charge of murder, above referred, to. The court reasoned that there was no doubt of the power of congress to govern the army and navy by bringing offenses committed in either under the cognizance of law courts, and that "this power is fully executed in respect to the army in the rules and articles of war adopted April 10, 1806" (2 Stat. 364); that in proceeding to institute and establish a system of criminal jurisprudence it was competent for congress to legislate over all subjects in a single statute or section; and that the language of the crimes act of 1790 is plainly extensive enough to include the commission of those crimes by the land forces of the United States in ports or places under the sole and exclusive jurisdiction of the United States. But the court inquired whether it was the intention of congress to apply this general legislation over crimes on land to like offenses committed in the army, and in answer to that inquiry directed attention to the fact that by the fiftieth article of the rules and articles of war all crimes not capital, though not mentioned in the articles of war, are to be taken cognizance of by courts-martial, and to be punished at their discretion; and that those rules and articles of war, although first adopted by the resolution of 1787, were re-enacted by a general adopting clause September 29, 1799, and were in force, therefore, as an act of congress, at the time when the crimes act was passed; and that on the date when the latter act was passed congress passed another act, regulating the military establishment, by the thirteenth section of which it was declared that the commissioned officers, noncommissioned officers, privates, etc., of the army, "shall be governed by the rules and articles of war which have been established by the United States in congress assembled, as far as the same

may be applicable to the constitution of the United States." The court then observed:

"Here, then, is a most positive and authoritative exposition of the crimes act, showing that it had no paramount operation over the land forces, but must be construed in subordination to the rules and articles of war applicable to the case. The thirty-second article of the existing rules of war is pertinent to show the understanding of congress that express legislation was necessary in order to bring officers and privates of the army to trial before the civil courts for capital crimes or acts of violence to the persons or property of citizens, and affords additional evidence that the crimes act of 1790 was not intended to apply to the land forces."

These views so expressed by Judge Betts were approved by Chancellor Kent in an edition of his Commentaries issued shortly thereafter, but they seem to have received no subsequent approval by any text-writer or by any court. On the other hand, the jurisdiction of the civil courts over offenses committed in the land forces of the United States has been sustained in several reported cases. In some, it is true, jurisdiction was assumed without discussion, but in others upon a full consideration of the grounds thereof. In U. S. v. Cornell, Fed. Cas. No. 14,867, 2 Mason, 61, decided in 1819, Mr. Justice Story took cognizance of a murder committed by one soldier upon another in Ft. Adams, and in support of his jurisdiction cited the provisions of the judiciary act of 1789. In U. S. v. Carr, Fed. Cas. No. 14,732, 1 Woods, 480, Mr. Justice Woods, sitting with Judge Erskine, entertained jurisdiction of a similar offense. In U. S. v. Cashiell, Fed. Cas. No. 14,744, 1 Hughes, 552, it was held that an acquittal before a court-martial cannot be pleaded in defense of an indictment in a court of law. The court remarked that "the military law as it exists in the United States is an exceptional code, applicable to a class of persons in given relations, and not abrogating or derogating from the general law of the land, but that the latter is left in full force and virtue." But we need not enter into a discussion of the question whether there is a double liability or liability both to the civil and military court. The question presented to us for decision, is whether a civil court has jurisdiction of the offense which is charged, there having been no assertion of jurisdiction by a court-martial, and there being no question of conflicting jurisdiction.

A case directly in point on the question of jurisdiction here involved is U. S. v. Clark (C. C.) 31 Fed. 710, a case in which Mr. Justice Brown, then the district judge for the Eastern district of Michigan, took cognizance of a homicide committed by a soldier in the performance of his alleged duty upon another soldier within a military reservation of the United States. The court, not without some hesitation at first as to whether a civil court could take cognizance of the case, came to the conclusion that the martial or military law does not supersede or interfere with the civil laws of the realm, and that there is a concurrent jurisdiction in the civil court; citing U. S. v. Cornell, U. S. v. Carr, and the opinion of Atty. Gen. Cushing in Steiner's Case, 6 Op. Atty. Gen. U. S. 413. We accept the rule stated in that decision, which is also in accord with the consensus of opinion of all the text-writers on military law, as embodying the law upon the question here under discussion. Forcible reasons may be suggested why

courts-martial should be given exclusive jurisdiction of all offenses which are punishable under the articles of war, but we are not convinced that either in the constitution or in the acts of congress the intention has been expressed to except from the jurisdiction of the civil courts offenses committed by any persons or class of persons, or, as was said by Mr. Justice Brown, to abdicate "that supremacy of the civil power which is a fundamental principle of the Anglo-Saxon polity."

The judiciary act of September 24, 1789, gives to the circuit courts "exclusive cognizance of all crimes and offenses cognizable under the authority of the United States, except where this act otherwise provides, or the laws of the United States shall otherwise direct." This enactment contemplates that the jurisdiction so exclusively conferred on the circuit courts may be made a concurrent jurisdiction with other tribunals whenever the laws of the United States shall so direct. It was so directed by the act of April 30, 1790, which provided that commissioned officers and others in the land forces "shall be governed by the rules and articles of war." The rules and articles of war consisted of a large number of regulations applicable to the government and discipline of the army, one of which provided for the punishment by courts-martial of certain designated offenses. There has been, and is, no express enactment that the jurisdiction of the military courts shall be exclusive, or that the general grant of jurisdiction to the circuit court shall in such cases be superseded. The intention to devest the civil courts of their regular jurisdiction will not be ascribed to congress in the absence of clear and direct language to that effect, in view of the "known hostility of the American people to any interference by the military with the regular administration of justice in the civil courts." Coleman v. Tennessee, 97 U. S. 514, 24 L. Ed. 1118. The articles of war in terms recognize the civil jurisdiction over offenses of the nature of that with which the plaintiff in error is charged, by providing in article 59 for delivering to the civil magistrates, except in time of war, "upon application duly made by or in behalf of the party injured," any officer or soldier "accused of a capital crime or of any offense against the person or property of any citizen of any of the United States which is punishable by the laws of the land." The case of the plaintiff in error would have come within this provision had he not been discharged from the army before proceedings were instituted against him. It was then a time of peace. The offense was charged to have been committed against the property of a citizen, and the place of the "party injured" was represented by "the law of the land, through the public prosecutor or the grand jury." Steiner's Case, 6 Op. Atty. Gen. U. S. 422.

It is contended that the indictment charges two offenses in one count, and that it is bad for duplicity, for the reason that it alleges that the forgery was committed with intent to defraud both the United States and John Cranson. It may be conceded that it is better pleading to make two counts in such an indictment, and to charge a separate intent in each; but we do not think that the defect referred to is a material one, or that it affects any substantial right of the ac-

118 F.—45

cused. We do not agree with counsel for the plaintiff in error that the indictment charges two offenses, one under section 5414 [U. S. Comp. St. 1901, p. 3662], and the other under section 5421 [U. S. Comp. St. 1901, p. 3667]. The indictment lacks the proper averments to constitute an offense under section 5421 [U. S. Comp. St. 1901, p. 3667]. It is brought solely for the forgery of an obligation of the United States under section 5414 [U. S. Comp. St. 1901, p. 3662]. The offense charged may properly be said to have been committed with an intent to defraud the United States, and an intent to defraud John Cranson. The United States would have been defrauded if the forgery had been undetected before the final discharge of Cranson as a soldier in the army of the United States. Cranson would have been defrauded if the forgery had been discovered before his discharge. It was impossible for the pleader to allege, or for the jury to find, which particular intent actuated the accused. From the nature of the act charged, the law will impute the intention to defraud all who might have been defrauded thereby.

The point is made that the indictment is defective for the reason that it fails to allege that F. M. Coxe was at the time of the commission of the offense a lieutenant colonel and deputy paymaster general of the army of the United States. If the indictment had charged only the commission of an offense with intent to defraud the United States, it might have been essential to allege therein that F. M. Coxe was in fact the officer who he was in the instrument represented to be; but, so far as it concerns the intent to defraud Cranson, it was not material whether F. M. Coxe was or was not the officer described in the instrument. Cranson might or might not have known whether F. M. Coxe was a paymaster general in the army. He might have been defrauded even if a fictitious name had been signed to the certificate.

It is contended, further, that the instrument described in the indictment is not an "obligation or other security of the United States," such as is referred to in section 5414 [U. S. Comp. St. 1901, p. 3662]. Section 5413 defines the words "obligation or other security," and declares that they shall mean, among other things, "certificates of indebtedness and certificates of deposit." But it is said that the paper which was signed by the plaintiff in error and delivered to Cranson was not a "certificate of deposit," as the term is understood both in common usage and in the statutes of the United States. It is true it does not contain all the incidents which belong to a "certificate of deposit," as that term is understood in banking. It acknowledges the receipt of money from the depositor for deposit with the United States, and the date, place, and amount thereof, but it does not state the time when the deposit is repayable. Notwithstanding this omission, we think that the paper is substantially a certificate of deposit. The law imports into its terms the time and conditions of repayment. It was a certificate issued for the deposit of money under section 1305 of the Revised Statutes [U. S. Comp. St. 1901, p. 925], which provides that any enlisted man of the army may deposit his savings with any army paymaster, who shall furnish him a deposit book in which shall be en-

tered the name of the paymaster and of the soldier, and the amount, date, and place of such deposit. Section 1306 [U. S. Comp. St. 1901, p. 925] provides for repayment of the money, with interest, to the soldier at the time of his final discharge. The paper charged upon in the indictment contains all the requirements of section 1305. In fact, it is a page from the book of deposit slips used by the paymaster under the provisions of that section.

It is contended that the court erred in admitting certain testimony offered by the defendant in error concerning the handwriting of the signature F. M. Coxe. The prosecution called an expert witness on handwriting, who testified that he had seen 419 signatures of the plaintiff in error, two lines of his writing on a photograph which was introduced in evidence, three lines of his handwriting on another paper, and the names Charles H. A. Brooke, Allen G. W. Coan, and John W. Woodrum, which he had written. He testified that after careful examination it was his opinion that the plaintiff in error wrote the name of F. M. Coxe upon the certificate. This testimony was received under the objection that the witness was not shown to be qualified or sufficiently acquainted with the handwriting of the plaintiff in error to testify as an expert. We cannot say that the court erred in admitting the testimony. It was shown that the witness was a qualified expert, and he testified that the examination which he had made was sufficient to qualify him to testify as he did, and that the reason why he asked for no more specimens of handwriting was that he did not consider it necessary. It is now objected that the writings which the witness resorted to to acquire a knowledge of the handwriting of the plaintiff in error were not in evidence or proved to be his writing. That, however, was not the ground of the objection. The objection was that no sufficient knowledge of handwriting could be acquired from the limited investigation which the witness made.

It is contended that the court erred in excluding testimony offered by the plaintiff in error to show that the signature of F. M. Coxe was not the handwriting of the plaintiff in error. Charles H. A. Brooke, a soldier, was called for the United States, who testified that he knew the handwriting of the plaintiff in error. On his cross-examination he was asked if from his knowledge of the handwriting of the plaintiff in error he believed that he signed the signature "F. M. Coxe." To this question an objection was made and sustained. We find no error in that ruling. The witness did not claim to be an expert on handwriting. All that he had testified was that he knew the handwriting of the plaintiff in error, had seen him write in the company records, and had seen a large number of official documents written and signed by him, and had seen many of his signatures on checks and deposit receipts. A knowledge of the handwriting of the plaintiff in error possessed by a witness who was not an expert in handwriting would not, of itself, qualify him to testify whether a forged signature made in imitation of the handwriting of another was or was not written by the plaintiff in error.

Error is assigned to the refusal of the court to give a certain requested instruction to the jury on the subject of reasonable doubt. The instruction so requested did not differ in material substance from

the instruction which the court gave upon that subject. There was no error, therefore, in refusing it.

We find in the record no error for which the judgment should be reversed. It is accordingly affirmed.