**UNITED STATES of America,
Plaintiff,**

v.

**Michael S. PRIME, Defendant.**

**No. CR01–0310L.**

United States District Court,
W.D. Washington
at Seattle.

Sept. 20, 2002.

Jay Warren Stansell, Federal Public Defenders Office, Seattle, WA, Lee A. Covell, Seattle, WA, for Michael Stefan Prime.

James T. Chou, U.S. Atty's Office, Seattle, WA, for U.S.

## ORDER REGARDING DEFENDANT'S MOTION IN LIMINE

LASNIK, District Judge.

On October 9, 2001, Michael S. Prime ("Prime") moved *in limine* to exclude expert testimony on handwriting identification at his trial or, in the alternative, for a hearing to determine the admissibility of such evidence pursuant to *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and

*Kumho Tire v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Prime's motion brought into issue the testimony of Kathleen Storer ("Storer"), a forensic document examiner ("FDE" or "examiner") working for the United States Secret Service in Washington, D.C. Storer was to testify for the government that, in her opinion, Prime's handwriting appeared on counterfeit money orders and other documents. In its response to Prime's motion, the United States insisted that expert testimony regarding handwriting analysis met the *Daubert* test and that no hearing was necessary. The Court held a *Daubert* hearing on March 18, 2002, and issued an order denying Prime's motion on April 3, 2002. (Dkt.# 121.) This ruling provides the reasoning behind the Court's conclusion that Storer's testimony was properly included at trial.

## I. THE APPLICABLE STANDARD

Until the Supreme Court issued its opinion in *Daubert*, the trial courts determined the admissibility of scientific evidence by applying the "general acceptance" test. *Daubert*, 509 U.S. at 585, 113 S.Ct. 2786. Under the "general acceptance" test, first articulated by the Court of Appeals of the District of Columbia in *Frye v. United States*, 293 F. 1013, 54 App.D.C. 46 (1923), expert opinion "based on a scientific technique [was] inadmissible unless the technique [was] 'generally acceptable' as reliable in the relevant scientific community." *Daubert*, 509 U.S. at 584, 113 S.Ct. 2786. In *Daubert*, the Supreme Court held that this "rigid" requirement had been superceded by Rule 702 of the Federal Rules of Evidence. *Id.* at 588, 113 S.Ct. 2786. At the time, Rule 702 provided that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Id.* (quoting Fed.R.Evid. 702).

In *Daubert*, the Supreme Court created a gatekeeping role for trial judges as to the admissibility of scientific expert testimony. The Supreme Court envisioned that trial courts would conduct a factor-based analysis when determining whether the testimony was reliable: (1) "whether [the theory or technique] can be (and has been) tested" (2) "whether the theory or technique has been subjected to peer review and publication" (3) "the known or potential rate of error" (4) "the existence and maintenance of standards controlling the technique's operation" and, finally, (5) " 'general acceptance' can yet have a bearing on the inquiry." *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. However, the opinion noted that the factors did not comprise "a definitive checklist or test." *Id.* at 593, 113 S.Ct. 2786. "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Id.* at 594–95, 113 S.Ct. 2786 (footnote omitted).[1]

Subsequently, in *Kumho Tire*, the Supreme Court expanded this gatekeeper

---

1. In 2000, Fed.R.Evid. 702 was amended to conform to *Daubert*. It provides:

   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702.

function to *all* expert testimony—i.e. not just that based on science. *Kumho Tire,* 526 U.S. at 147, 119 S.Ct. 1167. The *Kumho Tire* opinion acknowledged that trial judges would now have to apply the *Daubert* analysis in the context of experience-based expert testimony. *See id.* at 151, 119 S.Ct. 1167. Perhaps anticipating the problems that would follow if any particular *Daubert* factor was rigidly applied, the Supreme Court re-emphasized the flexibility that was inherent in the analysis: "[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert,* nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue." *Id.* at 150, 119 S.Ct. 1167. For instance, the reliability of engineering testimony could be gauged based on merit of its scientific foundations; however, "[i]n other cases, the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 150, 119 S.Ct. 1167. It made sense therefore to ask different questions of engineering versus perfume experts:

> In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

*Id.* at 151, 119 S.Ct. 1167. A flexible approach does not, however, imply a lax one. Even if testimony is based "upon professional studies or personal experience," trial courts are to ensure that the

expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167.

In *Kumho Tire,* the Supreme Court also clarified that the application of *Daubert* by trial courts was to be case- and fact-specific. There, the issue was the admissibility of the testimony of a tire failure expert, Dennis Carlson Jr.

> [N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience. Nor does anyone deny that, as a general matter, tire abuse may often be identified by qualified experts through visual or tactile inspection of the tire.... [T]he question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors "in deciding the particular issues in the case."

*Id.* at 156, 119 S.Ct. 1167 (internal citations omitted). The Supreme Court concluded that the district court's decision to exclude Carlson's testimony after finding that it satisfied none of the *Daubert* factors "*or any other* set of reasonable reliability criteria" was within its "lawful discretion." *Id.* at 158, 119 S.Ct. 1167 (emphasis in original).

Finally, in *Kumho Tire,* the Supreme Court reaffirmed that trial courts enjoy a certain amount of latitude in their admissibility decisions: A trial court's decision on whether or not to include expert testimony was to be reviewed under the abuse of discretion standard. *See id.* at 152, 119 S.Ct. 1167 (citing *General Electric Co. v. Joiner,* 522 U.S. 136, 138–139, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). Trial courts have the same broad discretion "in deciding *how* to test an expert's reliability" and "*whether or not* [an] expert's relevant tes-

timony is reliable." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167 (emphasis in original).

## II. STORER'S ANALYSIS

According to Storer, the premises underlying handwriting examination and identification are that (1) "No two writers share the same combination of handwriting characteristics" and (2) "Each writer has a range of variation centered within his/her basic writing habits." A proper examination requires sufficient samples of comparable "questioned" and "known" handwriting that are naturally executed. If adequate samples are available, an examiner conducts a side-by-side comparison, including a visual and a microscopic study. The comparison made is of several handwriting features such as style, smoothness, size relationships, slant, spacing, curvature, angularity, punctuation, etc. Similarities and differences in various features have varying levels of significance, and the latter influence the conclusion that is drawn. After the examination, an opinion is expressed on a nine-point scale: "[i]dentification", "[s]trong probability [of identification]", "[p]robable", "[i]ndications", "[n]o conclusion", "[i]indications did not", "[p]robably did not", "[s]trong probability did not" and "[e]limination." In the Secret Service, a second examiner conducts an independent examination without knowledge of the conclusion of the first.

In the case before the Court, the questioned documents comprised 76 exhibits such as envelopes, postal forms, money orders, post-it notes, express mail labels and postal box applications. The "known" handwriting came from three suspects in the case: 114 pages from David Hiestand ("Hiestand"), 14 pages from Jeff Hardy ("Hardy") and 112 pages from Prime. In Storer's opinion, Hiestand wrote portions of eight documents, Hardy wrote portions of one of the questioned documents and Prime wrote portions of 45 documents. These opinions ranked the highest in the nine-point scale (i.e.identification). As to portions of 14 questioned documents, Storer opined that Prime was the "probable" writer. As to portions of two exhibits, Storer rendered an "indications" opinion, i.e., that there were "few features which are of significance for handwriting comparison purposes...." As to 38 signatures, Storer rendered a "could not be determined" opinion and the remainder of the material had "no evidence of significance" according to her.

In December 2001, Storer issued a second report based on additional questioned material (two brown envelopes with hand printing). She was of the opinion that Prime was the writer of the material on the new exhibits.

## III. COURT TREATMENT OF HANDWRITING IDENTIFICATION.

Despite challenges to its reliability, handwriting comparison testimony has long been a feature of litigation in federal courts. For instance, in its 1902 opinion in *Neall v. United States*, 118 F. 699 (9th Cir.1902) the Ninth Circuit upheld the use of a handwriting expert in a case in which the government attempted to show that a military officer had forged a signature on a certificate of deposit:

It is contended that the court erred in admitting certain testimony offered by the defendant in error concerning the handwriting of the signature F.M. Coxe. The prosecution called an expert witness on handwriting, who testified that he had seen 419 signatures of the plaintiff in error, two lines of his writing on a photograph which was introduced in evidence, three lines of his handwriting on another paper, and the names Charles H.A. Brooke, Allen G.W. Coan, and John W. Woodrum, which he had written. He

testified that after careful examination it was his opinion that the plaintiff in error wrote the name of F.M. Coxe upon the certificate. This testimony was received under the objection that the witness was not shown to be qualified or sufficiently acquainted with the handwriting of the plaintiff in error to testify as an expert. We cannot say that the court erred in admitting the testimony. It was shown that the witness has [sic] a qualified expert, and he testified that the examination which he had made was sufficient to qualify him to testify as he did, and that the reason why he asked for no more specimens of handwriting was that he did not consider it necessary.

*Id.* at 707. By 1960, Ninth Circuit noted that it was "well settled" that "an expert in handwriting may testify and state his opinion as to whether different documents or signatures were written by the same person or are similar or dissimilar in respect of handwriting or whether a particular handwriting is genuine or disguised." *Robles v. United States,* 279 F.2d 401, 404–05 (9th Cir.1960) (internal citations, quotation marks and emendation marks omitted). In the same vein, the district court for the District of Columbia summarily stated in 1993: "It can be judicially noted that handwriting, like fingerprints, are subject to established objective tests, expert opinions about which are admissible." *Greenberg Gallery, Inc. v. Bauman,* 817 F.Supp. 167, 172 n. 5 (D.D.C.1993).

The world appears to have changed with *Daubert,* after which district courts began to cast a suspicious eye at the discipline of forensic document analysis. After *Daubert,* but prior to *Kumho Tire,* district courts had the option of analyzing handwriting comparison testimony under two alternative strands: They could either look at the area of forensic document examination as being grounded in scientific knowledge and apply *Daubert,* or treat it as nonscientific expert testimony, i.e., falling under the "technical, or other specialized knowledge" prong of Fed.R.Evid. 702. Analysis under both approaches was conducted in *United States v. Starzecpyzel,* 880 F.Supp. 1027 (S.D.N.Y.1995). After a *Daubert* hearing in which Judge McKenna himself occasionally questioned the examiner, the court treated the testimony as science-based and then applied the *Daubert* factors. Noting that two ongoing studies were being conducted by the U.S. Postal Laboratory and the Immigration and the Naturalization Service ("INS") Laboratory, the court ruled, first, that the discipline of handwriting analysis was "amenable to testing." *Starzecpyzel,* 880 F.Supp. at 1037. Second, the court found that the field had not, in fact, actually been subjected to rigorous testing and, therefore, the error rate as to any conclusions testified to by examiners was unknown.[2] As to the third *Daubert* factor, the court noted that FDEs publish in several journals. However, the court found the articles "to be significantly different from scholarly articles in such fields as medicine or physics, in their lack of critical scholarship." *Id.* Finally, the court found that the field did indeed receive general acceptance within the community of examiners and the legal community, but not from "financially disinterested parties, such as academics." *Id.* at 1038. In sum, the court concluded that "forensic document examination, despite the existence of a certification program, professional journals and other trappings of science, cannot, after *Daubert,* be regarded as 'scientific ... knowledge.'" *Id.* (citing Fed.R.Evid. 702).

---

**2.** The Postal Service and INS studies were incomplete at the time the opinion was rendered.

However, this did not result in an automatic ruling of inadmissibility: The court went on to state that *Daubert* did not apply to forensic document examiner testimony. The court ruled that such testimony was not based on science but on "technical, or other specialized knowledge." *See id.* at 1041–43. After outlining what FDEs actually do, the Court held that forensic document examiner testimony was admissible, largely on the grounds that (1) the jury could visually confirm the first part of an FDE's analysis in which the examiner identifies significant similarities and differences between genuine and challenged handwriting examples and (2) the other, unverifiable portion of analysis, in which the examiner draws inferences, was dependent on the first part, and the testimony was, in any event, subject to cross examination. *See id.* at 1044–47.

After *Kumho Tire* all expert testimony, whether based on science or not, is subjected to the *Daubert* screen. Circuit courts, admonished by the Supreme Court to review a district court's decision deferentially, generally have upheld district courts' decisions. *See, e.g., United States v. Jolivet*, 224 F.3d 902, 906 (8th Cir.2000) (upholding district court's decision to admit testimony of handwriting comparison expert); *United States v. Hernandez*, 42 Fed.Appx. 173 (10th Cir.2002) (upholding district court's decision to allow testimony on similarities and differences, but disallowing testimony on conclusions) (unpublished disposition); *United States v. Paul*, 175 F.3d 906, 912 (11th Cir.1999) (upholding district court's decision to exclude testimony of law professor critical of forensic document examination). *But see United States v. Velasquez*, 64 F.3d 844, 852 (3rd Cir.1995) (overturning decision to exclude testimony of same law professor).

Among district courts, handwriting comparison testimony has fared unevenly since *Kumho Tire*. Much of the evidence presented to the courts is the same (and indeed, mirrors that presented to this Court). Yet, after applying *Daubert*, courts have reached varying conclusions as to the reliability of such testimony.

In *United States v. Gricco*, 2002 WL 746037 (E.D.Pa.2002) (issued after the *Daubert* hearing in the case before the Court) the court found that testimony of an expert's "opinion that there [was] a handwriting match" between the defendant's exemplars and two government exhibits, including a handwritten list of materials allegedly used in manufacturing methamphetamine and a handwritten list of alleged laboratory supplies, was "sufficiently reliable for purposes of Rule 702." *Id.* at *1, *6. The court applied factors elucidated by the Third Circuit, *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 742 n. 8 (3d Cir.1994), which incorporate the *Daubert* analysis, and found that the case for admissibility was clear. In reaching its conclusion that handwriting analysis was "based on valid reasoning and reliable methodology," the court noted the pedigree of such evidence in courtrooms across the country that had been established under the approving eye of the circuit courts. *See id.* at *4 (noting that "the Third Circuit and other circuit courts have allowed testimony regarding handwriting matches, and accepted such testimony" as reliable enough to be admissible).

In contrast, in *U.S. v. Saelee*, 162 F.Supp.2d 1097 (D.Alaska 2001), the trial court ruled such evidence inadmissible. The questioned writing in the case involved address labels on packages, which the court presumed "would be considered a very small quantity of printing" and the defendant was an Asian whose first language was not known. *Id.* at 1104. In that case, the government sought to have its expert "testify only about the similari-

ties and differences between the known writing and the questioned documents and not to have [the expert] testify about his ultimate conclusions as to' whether defendant authored the questioned documents." *Id.* at 1098. Acknowledging that it was taking "one step further than other courts," the court concluded that after applying *Daubert* that the expert testimony "is as likely to mislead a jury as to assist it in determining the facts of this case. It is therefore excluded entirely." *Id.* at 1105.

In *United States v. Rutherford*, 104 F.Supp.2d 1190 (D.Neb.2000), the court found it helpful to break down the expert testimony into two components: (1) The comparison of the "stylistics of the defendant's handwriting" with the "handwriting(s) on the questioned documents" and (2) conclusions that the defendant was "the author of a signature or other writing on a questioned document." *Id.* at 1192–93. The former was not challenged by the defendant. The court found that the latter did not meet *Daubert/Kumho* requirements and was therefore excluded. *See id.* at 1194.

Similarly, in *United States v. Santillan*, 1999 WL 1201765 (N.D.Cal.1999), the district court limited the testimony to "the mechanics and characteristics of handwriting and testimony as to comparison of similarities between defendant's known handwriting and the handwriting on the 'questioned' documents, and barr[ed] any testimony concerning [the expert's] belief that the handwriting on the 'questioned' documents is in fact handwriting of the defendant." *Id.* at *5. *See also United States v. Hines*, 55 F.Supp.2d 62 (D.Mass. 1999) (similar conclusion regarding admissibility).

Trial court rulings reach one of three conclusions: (1) exclusion of all forms of expert testimony on handwriting comparison; (2) inclusion of the testimony on similarities and differences but exclusion of the expert's conclusions; and (3) and inclusion of comparison and expert testimony.

## IV. APPLICATION OF DAUBERT/KUMHO TIRE IN THE CASE BEFORE THE COURT

■ The challenge to handwriting evidence by Prime is two-fold. In 1998, in response to the *Starzecpyzel* decision, the U.S. Department of Justice issued a solicitation to conduct more studies to "determine the scientific validity of handwriting identification." Prime moved to exclude Storer's testimony on the ground that this solicitation was an admission by the Department that "in its present state, handwriting analysis cannot pass muster under *Daubert/Kumho Tire.*" This argument is clearly without merit. A solicitation to gather further data on handwriting examination is not an admission that the testimony fails to meet current requirements. Therefore, Storer's testimony is not to be excluded on this ground.

■ The heart of Prime's challenge, however, goes to the government's claim that handwriting and handprinting identification testimony meets the requirements of *Daubert* and *Kumho Tire.*[3]

Before the Court applies the *Daubert* factors to assess the admissibility of Storer's testimony, a few general observations are in order. First: *Daubert* and *Kumho Tire* were opinions issued in response to the increasing efforts to introduce novel theories in civil trials. By issuing these landmark opinions, the Supreme Court attempted to strike a balance between wholesale exclusion of most forms of non-

---

**3.** There is no dispute that Storer's testimony is relevant to the issues in the case and helpful to the jury. The issue raised is whether her testimony is reliable enough to be admissible.

scientific expert testimony, even that based on sound principles, versus liberal inclusion of such testimony, including that based on untested theories of highly dubious merit. Therefore, in *Daubert,* the Supreme Court overturned the trial court's exclusion of expert evidence based on the general acceptance test, but in *Kumho Tire,* upheld the exclusion of testimony based on a tire failure expert's obviously flawed methodology. These rulings have been used by some trial courts to exclude not just novel theories, but also time-tested techniques used almost universally by law enforcement, such as fingerprint and handwriting analysis. The Court believes that outright exclusion of such evidence is a mistake. While the Court agrees that the *Daubert* analysis needs to be applied to all expert testimony, the test, "depends upon the particular circumstances of the particular case at issue." *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. 1167. Where a novel theory is presented to a court, it makes sense to demand proof of statistically significant results and strict compliance with scientific methods. However, where a technique has been repeatedly applied and tested by law enforcement and by courts for over a century, the Court does not believe that the absence of scientific data, without more, should be the death knell for such testimony. In *United States v. Llera Plaza,* 188 F.Supp.2d 549 (E.D.Pa. 2002) Judge Louis H. Pollak reached a similar conclusion in an analogous situation where the testimony at stake was fingerprint identification based on a regimen known as "ACE–V." Judge Pollak acknowledged that such testimony did not satisfy all the *Daubert* factors. Nevertheless, he concluded that such testimony was admissible based largely on its historical acceptance by law enforcement and by English and American courts.

I am not persuaded that courts should defer admission of testimony with respect to fingerprinting ... until academic investigators financed by the National Institute of Justice have made substantial headway on a "verification and validation" research agenda. For the National Institute of Justice, or other institutions both public and private, to sponsor such research would be all to the good. But to postpone present in-court utilization of this "bedrock forensic identifier" pending such research would be to make the best the enemy of the good.... The ACE–V regime that is sufficiently reliable for an English court is, I conclude, a regime whose reliability should, subject to a similar measure of trial court oversight, be regarded by the federal courts of the United States as satisfying the requirements of Rule 702 as the Supreme Court has explicated that rule in *Daubert* and *Kumho Tire.*

*Id.* at 572–75. The Court agrees with Judge Pollak's conclusion and reasoning.

Second: The Court also believes that the *Daubert* inquiry is not intended to ask the "larger question" regarding the reliability of a particular technique in general. Rather, the inquiry is case-specific. In other words, all applications of handwriting identification testimony are not at issue in the motion before the Court. Rather, the Court will evaluate the reliability of handwriting expert testimony within the confines of the facts of this case. When the focus of the analysis shifts from the general to the specific, the number and nature of samples of questioned and known documents become important, as does the particular experience and training of the expert and the soundness of the method actually employed. This narrowed look does not, of course, detract from the standards of intellectual rigor to be demanded from the testimony; however, the Court believes that the Supreme Court adopted a sound approach when it stated in *Kumho Tire* that the "specific issue before the court was not the reasonable-

ness *in general* of a tire expert's use of a visual and tactile inspection to [reach his conclusion]. Rather, it was the reasonableness of using such an approach, along with Carlson's particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant.*" *Kumho Tire,* 526 U.S. at 153–54, 119 S.Ct. 1167 (emphases in original). The Supreme Court made clear, therefore, that even in the context of evaluating expert testimony, the focus of a trial court should be on the facts of the dispute before it rather than on theoretical issues that may be relevant to discussions in other contexts.

With these principles in mind, the Court will proceed to apply the *Daubert* factors to the expert testimony at issue.

The most important line of inquiry under *Daubert* for present purposes—and one that appears to have foiled the testimony of many a handwriting expert in other district courts—is whether the theory and technique of handwriting identification has been, or is capable of being, tested and whether handwriting identification has an acceptable error rate.[4] The Court understands this inquiry to include the following prongs: (a) whether the premises of handwriting identification are sound given the facts of this case; i.e., given the number of known samples of handwriting in this case, whether characteristics individual to Prime can be identified and used by a trained forensic examiner such as Storer; and (b) whether the work of professional forensic document examiners, such as Storer, can be, and has been, tested for accuracy and proficiency and what the error rates are in such tests.

The government and Storer have cited to several different sources as support for the proposition that handwriting is unique. Among the evidence were results from research conducted by the Center of Excellence for Document Analysis and Recognition ("CEDAR") at the State University of New York at Buffalo. The CEDAR research results were accepted for publication in the Journal of Forensic Sciences prior to the *Daubert* hearing. (Sargur N. Srihari ("Srihari"), Sung–Hyuk Cha, Hina Arora and Sangjik Lee, *Individuality of Handwriting,* J. Forensic Sci (approved for publication May, 2002).) Professor Srihari testified about his research at the *Daubert* hearing. (3/18/2002 Transcript of *Daubert* Hearing.) His project was undertaken with the purpose of testing the hypotheses underlying forensic document examination. A portion of Professor Srihari's study looked at the process of examining two writing samples and determining whether they were written by the same or different writer. Professor Srihari and his colleagues extracted features of handwriting—both "macro" features such as slant, and "micro" features such as the presence of openings in characters—and utilized these to compare documents using computer software. According to Professor Srihari, he obtained a 96 percent accuracy rate within his sample, which was "statistically inferable over the entire population." His conclusion was that "handwriting is individualistic." (*Id.*)

The government also refers to databases maintained by the Secret Service and the German law enforcement agency, Bundeskriminalamt ("BKA"). These so-called "Forensic Information System for Handwriting" ("FISH") databases of letters convert handwriting features into mathematical algorithms. The government claims that of the 90,000 writers in the German database, "the system has determined that

---

4. The first and third prongs of the *Daubert* analysis ask related questions and are dealt with together.

no two writers write alike, nor do they share the same combination of handwriting characteristics." The same conclusion can be reached from an analysis of the Secret Service's slightly smaller database of 9,000 writers, according to the government.

In addition, Storer refers in her affidavit to studies which show that the handwriting of twins can be distinguished. She cites numerous articles published in forensic science journals that conclude that handwriting is a distinguishable, individual trait. She also testified that her own personal experience showed that "every writer does have their [sic] own combination of individual characteristics."

As the Court already has noted, it need not address the reliability of handwriting evidence generally. However, within the confines of this case, the Court has no trouble concluding that the premises of handwriting identification are sound. Storer states she received as many as 112 pages containing specimen writing from Prime, samples that the defense itself characterizes as "extensive." Storer's training credentials are, furthermore, impeccable: She received a Master of Forensic Science degree from George Washing-ton University in 1988. From 1989 to the present she has been employed as an FDE with the Secret Service in Washington, D.C. At the Secret Service, she underwent a three-year apprenticeship or training program in document examination leading up to a certification on July 1, 1992. The training program in the Secret Service involves writing 18 research papers in the area of document examination and presenting them to peers for discussion. It also entails working alongside senior examiners who impart knowledge of their craft to the apprentices. Storer continues to take internal proficiency tests twice a year. Storer testified that she had never failed any of the in-house tests she was required to take by the Secret Service. In 1997, she was certified by the certifying body for forensic document examiners, the American Board of Forensic Document Examiners. The certification process included a three-part test: a practical, written and an oral test. With this extensive level of training by the examiner and the array of available writing samples, the Court has no trouble concluding that unique characteristics of Prime's handwriting may be established.[5]

5. The Court's conclusion is supported in general by the results of Professor Srihari's research. However, the Court acknowledges the limitations on the inferences that can be drawn from the study. Even if handwriting is individualistic when the examination is conducted by a computer, this does not necessarily establish that it will be so when subjected to human examination. Moreover, the evidence provided of the BKA and Secret Service databases, while marginally probative, appears to beg the question it is presented to answer, as pointed out by Professor Michael J. Saks ("Saks"), professor of law and of psychology at Arizona State University, who testified at the *Daubert* hearing for the defendant. The uniqueness or individuality of handwriting cannot be established simply by stating that different writers generate different algorithms. It is clear that individuality is an attribute that depends on the criteria used to judge the writing's characteristics: the more thorough the examination, the more likely that writings will appear unique (even if written by the same person). Dealing with the uniqueness question in a particular situation requires determining the criteria used to determine uniqueness, whether such criteria are reliable and whether these criteria were in fact applied in the case.

Professor Saks' criticisms as to the studies on twins are also well taken. That the writing of twins can be distinguished cannot be said to stand for the principle that writing is unique to every individual.

However, at least some of Professor Saks' criticism is more properly directed to the field of forensic document examination generally rather than being specifically applicable in the case before the Court. For instance, Saks cites to a 1958 study of signatures as being "extremely cautionary, if not devastating" to the hypothesis of individuality. (John J. Har-

As far as the proficiency and accuracy of FDEs are concerned, directly relevant to these issues are studies conducted in the 1990s by Professor Moshe Kam of the Electrical and Computer Engineering Department at Drexel University.[6] In his studies, Professor Kam compared the performance of professional forensic document examiners with non-professionals in matching handwriting. Professor Kam testified in court that the first of his studies showed that lay persons made far more types of errors than professional examiners. The second study showed that as a group, examiners' performance was different from that of lay persons: Lay persons rivaled professional examiners in being able to select different documents written by one person. However, lay persons also claimed erroneously that documents written by different people had the handwriting of the same person 38 percent of the time, whereas experts made the same mistake 6.5 percent of the time. As Professor Kam stated: "[I]t struck me very quickly that lay persons tend to see similarities and jump to a conclusion . . . [w]hereas document examiners always started the analysis—when I asked why did you make the decision—by trying to show me [sic] what's different." The third study showed

that a different incentive scheme did not make a difference in the results; it apparently also showed an unexplained improvement in the ability of laypersons to avoid false positives. The fourth study showed that professionals and laypersons did not differ significantly in detecting forgeries, but professionals were better at finding genuine signatures. Professionals erroneously concluded that forgeries were genuine 0.5 percent of the time whereas lay persons did so 6.5 percent of the time; professionals mistakenly concluded that genuine signatures were forgeries 7.1 percent of the times, lay persons did so 26.1 percent of the time.

The Kam studies indicate that handwriting identification is not error-free; however, the differences in error rates and results between professionals versus laypersons show that the field is one that is amenable to developing an expertise and that, with proper training, professionals can improve their accuracy. For the purposes of this case, the Court considers the expertise and testimony of Storer to be adequately tested. Further scientific testing on handwriting comparison and identification would undoubtedly aid in gauging the field's legitimacy; however,

---

ris, 48 How Much Do People Write Alike: A Study of Signatures, 48 J.Crim.L. & Criminology 647 (1958) ("Harris Study").) However, the Harris signature study has little bearing on the current case. In that study, the last names of people were cut out from handwriting on voter registration records. Examiners were then asked to compare the writing of the same last name, e.g., two different samples of the word "Smith" were compared. While Harris concluded that many of the signatures lacked individuality, the Court does not feel that the results of a one-word comparison can be extended to cover a case with the depth and breadth of questioned and known documents as the one before the Court. The availability of a large number and variety of samples of handwriting makes this a situation different not merely in degree, but in kind,

from the research published in the 1958 article. Saks' criticism is a warning, well taken, that trial courts should be wary of identification based on small samples of handwriting.

6. The Court finds that the studies conducted by Professor Kam are more relevant to its analysis than the statistical manipulation of data from proficiency tests conducted by the Forensic Sciences Foundation in the 1980s. The tests were not conducted using control groups; neither were the testing conditions taken into account. Moreover, the tests contained photographs, not original documents, and were administered to anyone who paid a fee. Given the availability of newer and more reliable data by Professor Kam, the Court finds that reliance on the proficiency tests is unnecessary.

as a legal matter, the field has been sufficiently tested by its long-established use and the research that already has been conducted. *Daubert* does not require more.[7] "The test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct. Rather, the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145–46 (3rd Cir.2000) (citing *Kannankeril v. Terminix International Inc.*, 128 F.3d 802, 806 (3d Cir.1997)).

The *Saelee* court's problem with the Kam studies was that "they did not *conclusively* establish that forensic document examiners can reliably do what they say they can do." *Saelee*, 162 F.Supp.2d at 1102 (emphasis added). However, the context of the *Saelee* court's ruling was entirely different: As already noted, the court was dealing with a writer whose native language was not known and with a small quantity of questioned documents. The *Saelee* court specifically noted that:

> [T]he court would point out that it is not holding that handwriting analysis can never be a field of expertise under the Federal Rules of Evidence. The court is merely holding that the Government has failed to meet its burden of establishing that the proffered expert testimony in this case is admissible under Rule 702.

*Saelee*, 162 F.Supp.2d at 1106. In any event, the Court disagrees with the *Saelee* court's apparent assumption that *Daubert* requires that the reliability of a process or technique be established "conclusively." As noted by the Supreme Court in *Daubert* itself: "[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786 (citations omitted). To the extent that there are gaps in the research—and there are—they need to be filled. The Court encourages the profession to respond forthrightly to Professor Saks' criticism and urges Professor Kam to reveal his data for the purpose of re-analysis. However, the fact that additional research can be done does not mean that FDE testimony should now be inadmissible on the ground that it has not been adequately tested. Such a ruling "would be to make the best the enemy of the good." *Llera Plaza*, 188 F.Supp.2d at 572.

The other *Daubert* factors also are satisfied in the case before the Court. It is clear to the Court that the forensic sciences, including document examination, are subject to extensive peer review. Storer testified at the *Daubert* hearing that journals publishing articles in this area include: The Journal of Forensic Sciences, the Journal of the American Society of Questioned Document Examiners, the International Journal of Forensic Document Examiners, the Canadian Society of Forensic Science Journal, the Journal of Forensic Identification and Forensic Science International. Articles sent for publication in the Journal of Forensic Science

---

7. Prime has attempted to show that there is a difference in accuracy in identifying documents with handprinting versus those containing cursive handwriting. However, Professor Kam testified at the hearing that there was not much difference between the performance of FDEs as to identification based on the two forms of writing. Furthermore, Storer herself testified that there was little difference in the examination and analysis process itself when the two forms of writing are compared. While Professor Kam indicated that more research in this area was necessary, the Court will not, without more, treat the identification of handprinting and cursive handwriting as different for the purposes of *Daubert*. In other words, the Court's analysis should be read to apply equally to Storer's opinions on handprinting and cursive handwriting identification.

are reviewed not just by handwriting experts but by others in the forensic sciences community. Even if this form of peer review is not conducted by academics, it does not mean that it is devoid of utility. As Professor Kam's testimony shows, forensic document examiners have a legitimate expertise based on years of experience and training. Their review of articles submitted for publication provides oversight on research in the field. The Court agrees with Judge Pollak in *Llera Plaza* that just because peer review is not conducted by scientists, this need not "militate against the utility of the identification procedures...." *Llera Plaza*, 188 F.Supp.2d at 563.

Furthermore, at least in the case of Secret Service examiners, the process of document identification goes through an "internal" peer review as well, since every document reviewed by such examiners is subject to a second, independent examination. Finally, it cannot be ignored that handwriting evidence has been tested and reviewed in the courtroom for decades. This usage itself provides some assurance of reliability. *Cf. United States v. Havvard*, 117 F.Supp.2d 848, 854 (S.D.Ind. 2000) (noting that "latent fingerprint identification has been subject to adversarial testing for roughly 100 years," a "track record [which] provides far greater assurance of reliability than, for example, publication of one peer-reviewed article describing a novel theory about the cause of a particular disease at issue in a civil lawsuit.")

Storer's testimony also showed that the field of document examination is moving toward establishing "standards controlling the technique's operation." *Daubert*, 113 S.Ct. at 2797. For one, the Secret Service laboratory where she works has maintained its accreditation with the American Society of Crime Laboratory Directors since 1998. This accreditation process requires an annual external proficiency test. Further, the standard nine-point scale for expressing opinions by the FDEs was established under the auspices of the American Standards and Testing Organization ("ASTM"). Perhaps in response to the enhanced scrutiny the field was receiving, a working group was formed in 1997 by the industry in order to standardize many of the processes utilized. Standards already established by ASTM include the terminology used in the profession, and the practice for receiving, documenting, storing and retrieving evidence in a laboratory. According to Storer, eight proposed guidelines are undergoing peer review. One of the standards that is being formalized is the comparison process itself. Under these circumstances, the Court finds that forensic document examination is making strides toward standardization. The fact that the document examination process has not been completely standardized is not necessarily a bar to admissibility in court. Not all expert testimony must be backed up by a standard procedure. Moreover, if a fact-finder is fully apprized of the process that is actually followed, and the expert is subject to cross-examination and to being countered by other experts, the lack of standardization can hardly be said to require exclusion.

Finally, it is clear to the Court that handwriting analysis has received broad acceptance. Law enforcement agencies such as Interpol, Scotland Yard, the Central Intelligence Agency, the Federal Bureau of Investigation and the United States Postal Inspection service use handwriting analysis. In addition, Storer listed 15 universities in the United States that offer Masters degrees in forensic science with courses that include document examination. As has already been noted, handwriting analysis has long been used in American courts. Even after *Daubert* and *Kumho Tire*, most district courts have ad-

mitted such evidence, albeit with limitations. Therefore, the general acceptance prong of *Daubert* is satisfied.

In sum, the Court is persuaded of the reliability of Storer's testimony; it was properly admitted and presented to the jury at trial. The Court acknowledges that had it required results of extensive scientific testing as exists in other fields, forensic document examination would come up short at the present time. However, the *Daubert* hearing made it very clear that the profession is in the process of making giant strides toward objective testing and standardization. The question before the Court, then, is whether in the interim period in which complete data are not available, the Court should exclude all FDE testimony as inadmissible. The Court is persuaded that, under *Daubert*, such testimony, including conclusions based on examinations, is reliable and admissible. Prime can present his own expert to dispute Storer's findings and/or to attack the entire field of forensic document examination as illegitimate.[8] However, the apparent recent trend to exclude FDE testimony is a result, the Court believes, of an excessively-rigid application of *Daubert*. Since *Daubert* applies in both criminal and civil cases, such an approach may, one day, result in unfortunate consequences for a criminal defendant who is denied the ability to present the best evidence that he did not author an extortion demand or pen a forged signature. The Court declines to follow this trend on the record before it.

### V. CONCLUSION

For the foregoing reasons, the Court denies the motion *in limine* and holds that

---

8. At his trial, Prime did call an expert to attack the legitimacy of Storer's analysis.

9. Since the Court has reached this conclusion under application of *Daubert,* the Court does

Storer's testimony was properly admitted at trial.[9]

not reach the government's argument that the reliability of handwriting evidence is indicated in Fed.R.Evid. 901(b)(3) and 28 U.S.C. § 1731.